## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN BARRY,** | : | **No. 3:04cv1330** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **LUZERNE COUNTY, GREGORY** | : | |
| **A. SKREPENAK, TODD** | : | |
| **VONDERHEID, ROBERT FUMANTI,** | : | |
| **WISTER YUHAS, and LUZERNE** | : | |
| **COUNTY CORRECTIONAL** | : | |
| **FACILITY BOARD,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Presently before the Court for disposition is Defendants' collective Motion for Summary Judgment on Plaintiff John Barry's Complaint.  This matter has been fully briefed and is ripe for disposition.  For the following reasons, we will grant the motion in part and deny it in part.

### I.      Background

Defendant Luzerne County Correctional Facility hired Barry in June 1987 as a correctional officer trainee, and after completing a probationary period, he became a correctional officer.  (Def. Ex. A in Supp. Summ. J. ("Def. Ex.") Barry Dep. 7)  In August 1990, he was promoted to desk sergeant, and in May 1994, he was promoted to control sergeant.  (Def. Ex. A, Barry Dep. 8)  In 1996, he was promoted to lieutenant and assigned to the prison records department.  (Def. Ex. B, Barry Investigation Hearing Tr. 60, Apr. 6, 2004)  Defendants Gregory Skrepenak, Todd Vonderheid, Robert Fumani, and Wister Yuhas

are members of Defendant Luzerne County Correction Facility Board (the "Prison Board").

On October 10, 2003, Hugo Selinski, a prisoner awaiting trial for murder, escaped from the prison.  (Pl. Ex. 3 in Opp. Summ. J. ("Pl. Ex."), Warden Gene Fischi Dep. 13) Selinski was a fugitive for approximately 72 hours before he submitted to authorities.  (Pl. Ex. 3., Fischi Dep. 13)  The escape became the subject of local and national media coverage.

Barry had been on duty for twenty minutes when the escape occurred.  (Def. Ex. A., Barry Dep. 33; Pl. Ex. 3, Fischi Dep. 55)  After the escape, he collected incident reports from the correctional officers on duty, provided them to Warden Gene Fischi, and informed him that the officers lied in the reports.  (Def. Ex. B., Investigation Tr. 55-57)   Barry's own written reports, however, did not include his accusation that the correctional officers lied. (Def. Ex. B., Investigation Tr. 67-70)  Warden Fischi did not immediately review the reports, discuss Barry's allegation with him, or direct another officer to investigate.  (Pl. Ex. 3, Fischi Dep. 55-57)  On October 12, 2003, despite Barry's accusation, Warden Fischi was quoted in the Scranton Wilkes-Barre Times Leader, a local newspaper, as stating that prison records reflected that the "seventh floor cells were properly checked by guards on schedule" on the night of the escape.  (Pl. Ex. 6, Times Leader Article, Oct. 13, 2005)  After the escape, Barry was contacted by a reporter with the Citizens Voice, another local paper.  (Def. Ex. F. Discipline/Dismissal Loudermill Hearing, N.T. 6, Oct. 24, 2003)  Barry spoke with the Citizens Voice in order to explain that the correctional officers' failures caused the escape, Warden Fischi knew of these failures yet falsely reported to the press that they had properly

2

completed their tasks, there were numerous unreported crimes in the prison, and these issues all created public safety problems.  (Pl. Ex. 4, Barry Aff. ¶ 19)  Barry also contacted a reporter with the Times Leader who interviewed him and Lieutenant Jenny Butcynski at Barry's home.  (Def. Ex. A, Barry Dep. 91, 93-94)  The reporter extensively quoted Barry's views in two articles published on October 15, 2003.  (Def. Ex. G, Times Leader Article, October 15, 2003)

One article, entitled "A Prison Run Amok," attributes numerous statements to Barry and Butcynski.  (Def. Ex. G, Times Leader Article, October 15, 2003)  It begins with a synopsis of four incidents where prison authorities ignored wrongdoing.  (Def. Ex. G, Times Leader Article, October 15, 2003)  Two were instances where inmates were found with narcotics, but either charges were not brought or the police were not notified.  (Def. Ex. G, Times Leader Article, October 15, 2003)  The third involved the prison authorities' failure to investigate sexual harassment.  (Def. Ex. G, Times Leader Article, October 15, 2003)  In the fourth incident, the prison authorities failed to reprimand an employee caught with a former inmate and two shotguns in his car.  (Def. Ex. G, Times Leader Article, October 15, 2003) "The incidents are among the many that Lts. John Barry and Jenny Butcynski say have occurred in the past two years under the unwatchful eye of Warden Gene Fischi and his two deputy wardens, Rowland Roberts and Ben Grevera."  (Def. Ex. G, Times Leader Article, October 15, 2003)  Barry and Butzynski reported they were "disgusted by the lack of oversight of the correctional officers, which they believe led to the escapes and multiple

3

other problems within the facility." (Def. Ex. G, Times Leader Article, October 15, 2003)

Barry called for Fischi, Roberts, and Grevera to resign. (Def. Ex. G, Times Leader Article,

October 15, 2003)  The article proceeded to list numerous other incidents gleaned from

written misconduct reports, including various instances where narcotics were discovered and

no charges were instituted. (Def. Ex. G, Times Leader Article, October 15, 2003)  It also

provided Fischi's and the deputies' explanations for the incidents and discipline. (Def. Ex.

G, Times Leader Article, October 15, 2003)  Fischi explained that his office has no power to

institute criminal charges against prisoners and referred many cases to the district attorney.

(Def. Ex. G, Times Leader Article, October 15, 2003)  Roberts explained that he may have

ignored possession of small amounts of marijuana, such as the residue left on the end of a

cigarette butt. (Def. Ex. G, Times Leader Article, October 15, 2003)  Fischi addressed the

incident where an officer was found with a former inmate, and explained that although

socializing with inmates is not tolerated, that incident involved a former inmate and the

socializing was not excessive and was merely a car ride. (Def. Ex. G, Times Leader Article,

October 15, 2003)  Fischi also explained that as lieutenants, it was Barry's and Butzynski's

duty to reprimand guards who failed to do their jobs. (Def. Ex. G, Times Leader Article,

October 15, 2003)  "They are my first line of supervision. . . . What do you think their job

is?" (Def. Ex. G, Times Leader Article, October 15, 2003)  Barry retorted that the

administration ignored his concerns and was not aggressive with the guards. (Def. Ex. G,

Times Leader Article, October 15, 2003)  He stated, "There is a breakdown of

4

communication in that prison. . . . The guards are not doing their jobs." (Def. Ex. G, Times Leader Article, October 15, 2003)

The second article provides an analysis of Selinski's escape, gleaned from official statements and prison reports "provided by the lieutenants." (Def. Ex. G, Times Leader Article, October 15, 2003) Selinski entered the cell of another inmate, Scott Bolton, and together they removed a window and used bed sheets tied together to flee the seventh floor of the prison. (Def. Ex. G, Times Leader Article, October 15, 2003) The reports indicated that guards were in the cell blocks at the time of the escape, but Barry stated "[n]obody was on the block." (Def. Ex. G, Times Leader Article, October 15, 2003) He explained that one report, which indicated that a guard was on the block, could not have been true because the guard "would have at least noticed that Selenski and Bolton were in another inmate's cell, which is not allowed." (Def. Ex. G, Times Leader Article, October 15, 2003) Barry repeated his allegation that guards rarely walk the blocks and the administration has been lax in enforcing the rules. (Def. Ex. G, Times Leader Article, October 15, 2003) The article concluded with Fischi's warning that "any individual who reveals information is 'strictly out of bounds.'" (Def. Ex. G, Times Leader Article, October 15, 2003)

Following the publication of the articles, the Prison Board directed Fischi and Assistant Solicitor Michael Kostelansky to investigate how prison records were released to the Times Leader and to secure the records. (Def. Ex. H, Kostelansky Dep. 27) On October 20, 2003, Barry was called into a meeting with Fischi, Kostelansky, and Deputy Warden

Grevera.  (Pl. Ex. 4, Barry Aff. ¶ 11)  During this meeting, Barry refused to answer any

questions until he had an opportunity to speak with his attorney because he believed he was a

"target" of the investigation.  (Pl. Ex. 4, Barry Aff. ¶ 11)  Following the meeting, Fischi

suspended Barry with pay because he refused to answer any question and failed to cooperate

with the inquiry.  (Def. Ex. H, Kostelansky Dep 33-38; Def. Ex. I, Fischi Letter to Barry, Oct.

21, 2003)

On October 21, 2003, Dr. Thomas Kowalski, president of the Prison Board at the

time, sent a letter to Barry drafted by Kostelansky explaining that on October 24, 2003, the

Board would convene to consider terminating his employment for five reasons: 1)

unauthorized removal of misconduct/incident reports regarding inmates; 2) dissemination of

information regarding inmates and former inmates to a newspaper; 3) failure to cooperate

with an internal investigation; 4) the disclosure of a former inmate's medical status to a

newspaper; and 5) the dissemination of information regarding two former inmates to a

newspaper in violation of state law.  (Def. Ex. J. Letter to Barry, Oct. 23, 2003)  The letter

informed Barry that he would have the opportunity to speak in his defense.  (Def. Ex. J.

Letter to Barry, Oct. 23, 2003)

On October 24, 2003, Barry participated in the hearing.  (Pl. Ex. 11, Discipline

Hearing Tr., Oct. 24, 2003)  Kostelansky, Kowalski, and Prison Board member Constance

Wynn were present.  (Pl. Ex. 11, Discipline Hearing Tr., Oct. 24, 2003)  Barry denied: 1)

removing property from the prison without permission; 2) providing prison reports to the

press; 3) taking copies of documents home from the prison; and 4) having a shoe box of prison records at his house.  (Pl. Ex. 11, Discipline Hearing Tr., Oct. 24, 2003)  Following the hearing, Barry remained on paid suspension.  (Def. Ex. K, Kowalski Dep. 69-70)

In 2004, a new Prison Board was assembled following the election of new County Commissioners and the appointment of new lay members to the Board.  On April 6, 2004, Barry participated in a second investigative hearing before the Prison Board.  (Pl. Ex. 5, Investigative Hearing Tr., Apr. 6, 2004)  At this hearing, he was represented by counsel. Prison Board members Fumanti, Vonderheid, Skrepenak, Yuhas, and Stephen Urban were present.  (Pl. Ex. 5, Investigative Hearing Tr., Apr. 6, 2004)  During the hearing, Barry admitted that throughout his employment with the prison he made copies of prison records and reports, transported them out of the prison, and stored them in a shoe box.  (Pl. Ex. 5, Investigative Hearing Tr. 25-26, Apr. 6, 2004)  Barry explained that he did not raise his complaints about prison management with the Prison Board because he believed he would be fired, and the sole friendly member of the Board, Steven Urban, would have been unable to prevent other members of the Board from firing him.  (Pl. Ex. 5, Investigative Hearing Tr. 47-48, Apr. 6, 2004)

On June 21, 2004, by a vote of two to one, the Board voted to demote Barry from his position as a lieutenant to a correctional officer trainee. (Def. Ex. P)  Shortly thereafter, Barry resigned, explaining that he was unable to meet his financial obligations on the salary of an correctional officer trainee.  (Def. Ex. R)

## II.    Jurisdiction

Since a federal question is before the Court pursuant to 42 U.S.C. § 1983, we have

jurisdiction over this dispute under 28 U.S.C. § 1331.

## III.    Standard

Granting summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV.

P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in

the light most favorable to the party opposing the motion.  International Raw Materials, Ltd.

v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving

party to demonstrate that the evidence is such that a reasonable jury could not return a verdict

for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it

might affect the outcome of the suit under the governing law.  Id.  Where the non-moving

party will bear the burden of proof at trial, the party moving for summary judgment may meet

8

its burden by showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v.

Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden

shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts

by the use of affidavits, depositions, admissions, or answers to interrogatories showing that

there is a genuine issue for trial.  Id. at 324.

### IV.   Discussion

Barry advances claims pursuant to 42 U.S.C. § 1983 for alleged violations of the First

Amendment, Due Process Clause, and Equal Protection Clause.

In pertinent part, section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Thus, a plaintiff must establish two criteria to state a claim under section 1983.  First,

the conduct complained of must have been committed by a person acting under color of state

law.  Second, the conduct must deprive the complainant of rights secured under the

Constitution or federal law.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142

F.3d 582, 590 (3d Cir. 1998).  The defendants argue that each of Barry's constitutional

claims fails.  We will address these issues seperately.

9

**A.      First Amendment**

Barry argues that the defendants demoted him in retaliation for the exercise of his

First Amendment rights.  He argues that his speech published in the Times Leader on

October 15, 2003, as well as his refusal to cooperate with Fischi on October 20, 2003,

constituted protected conduct.  "[T]he First Amendment protects a public employee's right,

in certain circumstances, to speak as a citizen addressing matters of public concern."

Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006) (citations omitted).  Courts employ a three

step analysis to determine whether a plaintiff has established a First Amendment retaliation

claim.

First, the plaintiff must demonstrate that he "spoke as a citizen on a matter of public

concern."  Id. at 1958 (citing Pickering v. Board of Ed. of Township High School Dist. 205,

Will City, 391 U.S. 563, 568 1968)).  If he did, the court must determine "whether the

relevant government entity had an adequate justification for treating the employee differently

from any other member of the general public."  Id. (citing Pickering, 391 U.S. at 568).  These

determinations are questions of law for the court.  Baldassare v. New Jersey, 250 F.3d 188,

195 (3d Cir. 2001) (citations omitted).

Second, the plaintiff must establish "the protected activity was a substantial or

motivating factor in the alleged discriminatory action."  Id.  Third, the government "can rebut

the claim by demonstrating 'it would have reached the same decision . . . even in the absence

10

of the protected conduct.'" Id. (quoting Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,

429 U.S. 274, 287 (1977)).  The second and third stages present questions of fact for the jury.

Id. (citations omitted).

Defendants present five arguments pertinent to Barry's First Amendment claim.  First,

they argue that he did not engage in protected conduct.  Second, they maintain that even if he

did, they are entitled to qualified immunity.  Third, they claim that his suspension with pay

did not constitute an adverse action.  Fourth, they argue that Defendant Skrepenak did not

cause any adverse action, and thus he must be dismissed as a defendant.  Fifth and finally,

they argue that Luzerne County cannot be liable as a municipality based on the decision of

the Prison Board.

## 1.        Protected Conduct

Plaintiff alleges he engaged in protected speech when he spoke with the Times Leader

about problems within the prison.  The parties do not dispute that Barry's statements

addressed matters of public concern.  The Selinski escape attracted widespread media

attention and prison security is a matter of public concern.  See Cygan v. Wisconsin

Department of Corrections, 388 F.3d 1092, 1100 (7th Cir. 2004).

Thus, we must discern whether Defendants had adequate justification for treating

Barry differently from a member of the public by conducting a "'balance between the

interests of the [employee] . . . in commenting upon matters of public concern and the interest

of the State, as an employer, in promoting the efficiency of the public services it performs

through its employees." Watters v. City of Philadelphia, 55 F.3d 886, 891-92 (3d Cir. 1995)

(quoting Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)).  On the plaintiff's side, we

consider his interests as well as the "public's interest in 'free and unhindered debate.'" Id.

(quoting Versarge v. Clinton, 984 F.2d 1359, 1366 (3d Cir. 1993)).  Since the interests must

truly be balanced, where an employee demonstrates either that he or the public has a

heightened interest in his speech, the government's corresponding burden to justify the

dismissal is also heightened.  Watters, 55 F.3d at 895 (citing Connick, 461 U.S. at 150).

On the defendants' side, we consider the "employer's interest in 'the effective and

efficient fulfillment of its responsibilities to the public." Id. (quoting Connick, 461 U.S. at

150).  In weighing this interest, we consider factors such as, "whether the statement impairs

discipline by superiors or harmony among co-workers, has a detrimental impact on close

working relationships for which personal loyalty and confidence are necessary, or impedes

the performance of the speaker's duties or interferes with the regular operation of the

enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

Defendants argue that their interests outweigh Barry's because he disrupted the

prison's operations by speaking outside of the chain of command.  They rely primarily on

Ober v. Evanko, where the court found that the First Amendment did not protect a

Pennsylvania State Police officer's right to violate a department regulation by presenting his

grievances to a member of the department other than his superior.  80 Fed. Appx. 196, 201

(3d Cir. 2003).  The regulation required that state police members report suspected

12

wrongdoing to their superiors, but the plaintiff did not inform his superior and informed another officer instead.  Id.  The court viewed his claim as "one of retaliation for speaking outside the chain of command."  Id.  In finding that the First Amendment did not protect this right, the court reasoned: "These regulations were designed to promote efficiency and trust, to maintain order and discipline, and to effectively alert superiors to potential problems or wrongdoing. The need to enforce compliance with these regulations far outweighs Ober's interest in violating them."  Id.

We find Ober distinguishable from the instant case.  There, the plaintiff complained within the department, and thus the sole interest the court considered was his interest in violating the chain of command.  Id.  Here, Barry did not merely speak within his department, but complained in a public forum, the news media.  Thus, we must not only consider Barry's interest in his speech, but also consider the public's interest in access to the information.  "[T]he First Amendment interests at stake extend beyond the individual speaker.  The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." Garcetti, 126 S.Ct. at 1958.

Moreover, in some situations, the violation of a chain of command policy does not outweigh a public employee's and the public's interest in speech on matters of public interest.  In Czurlanis v. Albanese, the plaintiff, an auto mechanic employed by the defendant county, alleged that he was fired in retaliation for numerous statements he made before the

13

county board.  721 F.2d 98, 100-02 (3d Cir. 1983).  The defendants argued that the plaintiff

made these statements outside of the established chain of command.  Id. at 105-06.  The

court noted that the employer's policy did not delineate "what matters would be covered by

the chain-of-command policy and what matters would be regarded as appropriate for public

speech by a County employee."  Id. at 105.  Thus, the court found that the breach of the chain

of command could not justify retaliating against the plaintiff.  Id.

> It is simply incompatible with the principles that underlie the First
> Amendment to countenance a policy that would severely circumscribe in
> this manner speech on public issues, which occupies the "highest rung of
> the hierarchy of First Amendment values". . . . A policy which would
> compel public employees to route complaints about poor departmental
> practices to the very officials responsible for those practices would
> impermissibly chill such speech.

Id. at 105-06 (citations omitted).

In finding that the county's interest did not outweigh the plaintiff's, the court focused

on the plaintiff's "hierarchical proximity" to the criticized officials and whether his speech

had strained relationships with co-workers with whom personal loyalty and confidence was

necessary.  Id. at 106.  It observed he was not "normally in contact" with the criticized

officials "'in the course of his daily work.'"  Id.  (quoting Pickering, 391 U.S. at 569-70).

Thus, his position in the hierarchy did not require personal loyalty and confidence and "there

is no evidence that a needed close working relationship was destroyed."  Id.  Therefore, even

though the plaintiff circumvented the chain-of-command, the court concluded that the

disruption did not outweigh the plaintiff's First Amendment interests because he did not

undermine a relationship of personal loyalty and confidence.[1]

The hierarchical proximity and need for personal loyalty and confidence, while never

dispositive alone, are the most important considerations in the disruption analysis.  In

Sprague v. Fitzpatrick, the court found the plaintiff's criticism of the defendant district

attorney was not protected because the plaintiff, as the first assistant district attorney,

functioned as the defendant's "alter ego" and was his "direct administrative and policy-

making subordinate."  546 F.2d 560, 565 (3d Cir. 1976).  In Curinga v. City of Clairton, the

---

[1] Defendants have also argued that they were justified in treating Barry differently from a member of the public because he provided the internal reports to the Times Leader in contravention of a prison policy prohibiting the dissemination of information to anyone other than a law enforcement agency without prior prison approval.  See Jurgensen v. Fairfax County, 745 F.2d 868, 882 (4th Cir. 1984) (finding that the release of a confidential report to a reporter was not protected even if the document addressed a matter of public interest because the dissemination violated the employer's regulation and thus amounted to insubordination); Barnard v. Jackson County, 43 F.3d 1218, 1224 (8th Cir. 1995) (finding that the release of the results of a government investigation to the media was not protected where the plaintiff violated his employer's regulation requiring that results be provided to the government employer prior to the media because his position required loyalty and the employer had an interest in obtaining this information first).  But see Czurlanis, 721 F.2d at 105-06 (finding that the violation of a policy requiring that complaints be directed to immediate supervisor could not justify terminating employee who presented complaints to county board and did not strain close working relationship requiring confidentiality and loyalty).  Barry, however, has disputed that this policy existed and claims that even if it did, it violated the First Amendment.  See Harman v. City of New York, 140 F.3d 111, 119-20 (2d Cir. 1998) (finding that a regulation requiring all child services employees to receive their employer's permission before speaking with the press about any agency policy or activity violated the First Amendment).  We need not decide at this stage whether such a policy violates the First Amendment because Defendants have produced no evidence that such a policy existed or to what activity it applied.  Defendants cite to a portion of Barry's deposition as evidence of this policy, but it has not provided this portion as part of the record.  See Def. Stat. Mat. Fact. ¶ 18 (citing Ex. A, Barry Dep. 75, 77-78).  But see Def. Ex. A, Barry Dep (including pages 72 and 80, but not 75, 77, or 78).  Defendants have not produced a copy or any other evidence of this policy, and Barry disputes that it existed.  See Pl. Counter Stat. of Mat. Fact. in Opp. Summ. J.¶ 18.  Therefore, there is a genuine issue of material facts as to whether the defendants imposed this policy.

15

plaintiff's criticism of city council members was not protected because, as the municipal

manager, he "occupied the most sensitive, high-level policy making appointive position in

the City of Clairton, one that required confidentiality and a close working relationship with

city council members to effectively implement their policies."  357 F.3d 305, 313 (3d Cir.

2004).  In Versarge v. Township of Clinton, the court found that the plaintiff's complaints

about the fire chief were not protected because the plaintiff's comments created "extreme

malcontent" among his fellow members of the fire company.  984 F.2d 1359, 1366 (3d Cir.

1993).  In contrast, in Waters v. City of Philadelphia, the court found that the plaintiff police

officer's criticism of the management of a police employment program was protected speech

because there was no evidence that the plaintiff's position required a "close working

relationship" with the police commissioner, they did not interact on setting policy, and he

appeared to work within a "discrete operation within the Police Department."  55 F.3d 886,

898 (3d Cir. 1995).

Here, however, the record before the Court does not provide evidence of whether

Barry was required to interact on a daily basis with the individuals he criticized in the Times

Leader articles.  There is no evidence on whether Barry's position required that he maintain a

relationship of personal loyalty and trust with Fischi, Roberts, Grevera, or the individual

correctional officers he claimed lied in their reports.  Although it is clear that Barry

ultimately reported to Fischi, it is equally clear that neither Fischi nor the deputies were his

direct superiors and there was at least one rank, captain, between them.  Based on the record

before us, we cannot determine whether "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." Sprague, 546 at 564 (quoting Pickering, 391 U.S. at 570 n.3). Summary judgment is inappropriate where the plaintiff's relationships are unclear and it cannot be determined whether the speech destroyed a "needed close working relationship. See Zamboni v. Stamler, 847 F.2d 73, 79 (3d Cir. 1988) (reversing summary judgment and remanding for the district court to determine the plaintiff's role in the office, the nature of his office relationships, and the effect of the speech). Accordingly, we will deny Defendants' motion for summary judgment on whether Barry's comments in the October 15, 2003 articles were protected speech.[2]

Barry has additionally argued that his refusal to cooperate on October 20, 2003 without his attorney present was protected by the First Amendment. We find that Defendants have presented sufficient evidence of disruption caused by Barry's insistence on his counsel's presence to hold that this action was not protected by the First Amendment. During the meeting, Barry effectively stopped the investigation and completely prevented the prison from utilizing him as an employee. Government business would become ineffective if

---

[2] We recognize that this issue is a question of law, Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (citations omitted), which normally would be appropriate for summary judgment. However, if underlying facts necessary for the analysis are disputed, they are questions for the jury, Bennis v. Gable, 823 F.2d 723, 729 & n.6 (3d Cir. 1987), and if these facts are not presented to the court, it cannot grant summary judgment, Zamboni, 847 F.2d at 79.

17

every government employee could refuse to cooperate with his superiors unless his attorney was present.  Barry relies on <u>Cipriani v. Lycoming County Housing Authority</u>, where the plaintiff, a government employee, advised his superiors that he intended to attend a meeting with an attorney after work to discuss his rights as an employee.  177 F. Supp. 2d 303, 312 (M.D. Pa. 2001).  Immediately thereafter, the defendants placed him on administrative leave. <u>Id.</u>  The court found that these facts created a jury question as to whether the defendants violated his First Amendment right to seek legal counsel.  <u>Id.</u>  "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."  <u>Id.</u> (quoting <u>Denius v. Dunlap</u>, 209 F.3d 944, 953 (7th Cir. 2000)).

We find <u>Cipriani</u> distinguishable because here, the government's interest outweighs Barry's.  The First Amendment right to consult with an attorney implicates "First Amendment rights of association and free speech."  <u>Denius</u>, 209 F.3d at 953-54.  Although the <u>Pickering</u> line of cases generally deals with the speech clause of the First Amendment, we find no reason to ignore Defendants' interest in the efficient administration of public services merely because Barry's rights of association and free speech are at issue in his right to counsel claim.  Courts have routinely applied the <u>Pickering</u> analysis when considering whether a public employer's interest outweighs its employees' First Amendment association rights.  <u>See, e.g.</u>, <u>Cook v. Gwinnett County School District</u>, 414 F.2d. 1313, 1320 (11th Cir. 2005).  In political association cases, courts consider whether "a difference in party affiliation was 'highly likely to cause an official to be ineffective in carrying out'" his duties.

18

Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004) (quoting Ness v. Marshall, 660

F.2d 517, 521 (3d Cir. 1981)).  Although Curinga observed that the Pickering analysis does

not apply in a political association retaliation claim and courts instead apply the analysis

announced in Elrod v. Burns, 427 U.S. 347 (1976), under either analysis courts consider the

government's interest in effectively carrying out services for the public.  Id.

Here, that interest clearly outweighs Barry's interest in his counsel's presence during

the internal inquiry.  Barry refused to cooperate with his employer's investigation because his

attorney was not present at that time.  If a government employee could refuse to answer to his

superior unless his attorney was present, public services would "grind to a halt."  Chotiner v.

Philadelphia Housing Authority, No.Civ.A. 02-9504, 2004 WL 2915296, at *7 (E.D. Pa.

Dec. 15, 2004) (distinguishing Cipriani on the basis that the plaintiff there sought to speak

with counsel after work, and noting that the government's interest in efficiency must

outweigh the employee's interest in having his counsel present during a government

meeting).  Therefore, we find that Barry's refusal to cooperate was not protected action.

Accordingly, we will grant summary judgment on Plaintiff's First Amendment claim

to the extent it rests on his refusal to cooperate with the prison investigation on October 20,

2003, but deny it to the extent that it rests on his comments published in the Times Leader on

October 15, 2003.

### 2.    Qualified Immunity

Defendants argue that even if they did violate Plaintiff's First Amendment rights, they

are entitled to qualified immunity.  "The doctrine of qualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Where the [Pickering] balancing factors weigh heavily in favor of the employee, the law is clearly established and qualified immunity is unavailable."  Id. (quoting Ceballos v. Carcetti, 361 F.3d 1168, 1173 (9th Cir. 2004)).  Although the right to be free from retaliation for protected conduct is clearly established, see, e.g., id., there are factual issues regarding whether the defendants reasonably believed that their conduct did not violate these rights.  Thus we cannot resolve the qualified immunity issue at this juncture because we have insufficient evidence to determine whether the balancing factors heavily weigh in favor of the employee.  See Karnes v. Skrutski, 62 F.3d 485, 491-92 (3d Cir. 1995) (finding that the second prong of the qualified immunity analysis "may require factual determinations if the nature of the conduct is disputed").

### 3.     Adverse Action

Defendants next argue that Barry's suspension with pay was too insubstantial to support his claim.  We disagree.  Retaliatory conduct will suffice to support a section 1983 claim if it was "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment Rights."  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000).  "The effect of the alleged conduct on the employee's freedom of speech 'need not be great in order to be

actionable,' but it must be more than de minimis." <u>McKee v. Hart</u>, 436 F.3d 165, 170 (3d Cir. 2006) (quoting <u>Suppan v. Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000) (quoting <u>Bart v. Telford</u>, 677 F.2d 622, 625 (7th Cir. 1982)).

In <u>Suppan</u>, the defendant gave the plaintiffs low rankings on a promotion scale, allegedly in retaliation for their union activities. 203 F.3d at 235. The defendants argued that the plaintiffs could not establish a causal connection between the rankings and the plaintiffs' lack of promotions, and therefore, they could not establish that they suffered an adverse retaliatory action. <u>Id.</u> The court disagreed, and found the plaintiffs stated a claim because they alleged, "a campaign of retaliatory harassment culminating in the retaliatory rankings" which a reasonable jury could conclude would deter a person of ordinary firmness from exercising his First Amendment rights. <u>Id.</u>

In <u>Suppan</u>, like here, the plaintiff received his paycheck and still suffered an adverse action. We find that a reasonable jury could conclude that suspension with pay could deter a reasonable person from exercising his or her First Amendment rights, and we will deny the motion for summary judgment on this ground.

### 4.    Skrepenak's Liability

In addition, Defendant Skrepenak argues that he caused no adverse action because he voted against Barry's demotion. On June 21, 2004, the Prison Board convened to rule on Barry's employment status. (Def. Ex. P in Supp. Summ. J.) Defendant Skrepenak started the meeting by moving to terminate Barry, but the motion was not seconded. (<u>Id.</u>) Defendant

21

Vonderheid then moved to demote, and Defendant Fumanti seconded the motion.  (Id.)

Vonderheid and Fumanti then voted to demote, and Skrepenak voted against it.  (Id.)

Therefore, the motion passed by a two to one vote and the Prison Board demoted Barry.  (Id.)

Barry argues that whether the motion to terminate "played a role in the ultimate action taken

against Mr. Barry" presents an issue of fact for the jury.  (Pl. Br. in Opp. Summ. J. 24)  We

disagree.  Barry has presented no evidence that the initial motion to terminate somehow led

to or caused the motion to demote and the ultimate demotion.  "When a motion for summary

judgment is made and supported as provided in this rule, an adverse party may not rest upon

the mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts

showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Barry has not set forth

specific facts demonstrating that Skrepenak caused his demotion, and therefore, we will grant

the motion for summary judgment.

### 5.    Municipal Liability

Luzerne County asserts it cannot be liable based on the decision of the Prison Board

because it is a separate entity.  We disagree.  The County cannot be held liable as a

municipality for the constitutional torts of its employees based solely on the doctrine of

*respondeat superior*.  Robinson, 120 F.3d at 1295 (citing Monell v. Dept. of Social Services,

436 U.S. 658 (1978)).  "Municipal liability attaches only 'when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly

be said to represent official policy, inflicts the injury' complained of." Id. (quoting Monell,

436 U.S. at 694).  A plaintiff can demonstrate that a municipality's course of conduct

amounts to government policy when "a decisionmaker possessing final authority to establish

municipal policy with respect to the action 'issues an official proclamation, policy, or edict.'"

Andrews, 895 F.2d at 1480 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481

(1986)).

We find that the Prison Board is the authorized policymaker of Luzerne County for

the purposes of making policy decisions regarding the prison.  There is no question that the

Prison Board had the authority to bind the County to its decision regarding Barry's

employment, and its decision in this regard was final.  Indeed, the County asserts that the

Prison Board should be liable because it possessed the final decisionmaking authority and the

County Board did not.  The County cannot immunize itself from constitutional harm that its

policies cause merely by delegating the authority to create the policy to an independent

board.  The Prison Board was the authorized decisionmaker possessing authority to establish

municipal policy with regard to the prison, and the County can be bound based on the

Board's official proclamations, policies, or edicts.  Therefore, we will deny the motion for

summary judgment on the County's liability as a municipality.

**B.    Due Process**

Defendants argue that Plaintiff cannot state a due process claim because he did not

have a protected interest in his job and he was afforded notice and a hearing before the

adverse employment actions.  Plaintiff responds that the hearings were insufficient to provide

due process, but advances no argument or evidence to support his claim that he had a

protected interest in his job.  Thus, we find Plaintiff has failed to create a genuine issue of

material fact.

> To have a property interest in a job, however, a person must have more than a
> unilateral expectation of continued employment; rather, she must have a
> legitimate entitlement to such continued employment. . . . The decisional law is
> clear that an at-will employee does not have a legitimate entitlement to
> continued employment because she serves solely at the pleasure of her
> employer.

Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005).

In Pennsylvania, public employees generally serve as at-will employees.  Id.  Plaintiff

has provided no reason why this general rule does not apply, and therefore, we will dismiss

his due process claim because he had no legitimate entitlement to continued employment.

### C.    Equal Protection Claim

Plaintiff claims that his rights under the Equal Protection Clause were violated when

he was demoted and constructively discharged.  He relies on the "class of one" theory

announced in Village of Willowbrook v. Olech, 528 U.S. 562 (2000).  To satisfy a "class of

one" claim, a plaintiff must establish: "(1) the defendant treated him differently from others

similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis

for the difference in treatment."  Hill v. Kutztown, __ F.3d __ (3d Cir. 2006).  Plaintiff

claims that numerous other prison employees who broke rules were "similarly situated" for

the purpose of his claim.  We disagree.  The guards he identified did not have similar

24

disciplinary records[3] and he has produced no evidence that any of them refused to participate in a prison investigation.  Furthermore, there is no evidence that their alleged infractions were similar.  Plaintiff also claims that Warden Fischi was similarly situated because Fischi spoke with the media.  Fischi, however, was the warden, not a lieutenant.  Moreover, there is no evidence that Fischi had a comparable disciplinary record or refused to cooperate with a prison investigation.  Perhaps recognizing that he was not treated differently from the sole individual similarly situated, Jennifer Butzynski, Barry claims he was a class of "two."  Butzynski was the other lieutenant who was quoted in the Times Leader and Barry has offered no evidence that she was treated differently.  Therefore, we find that plaintiff has not identified similarly situated individuals who were treated differently, and we will dismiss his equal protection claim.

## V.      Conclusion

For the reasons expressed above, we will grant Defendants' motion in part and deny it in part.  We will grant the motion for summary judgment on Barry's due process and equal protection claims.  We also will grant summary judgment for Defendant Skrepenak on the First Amendment claim because Barry presented no evidence that he caused the demotion.  We will grant summary judgment on the First Amendment claim to the extent that it rests on Barry's refusal to cooperate without his attorney present on October 20, 2003.  We will deny the motion in all other respects.  Therefore, Barry will proceed to trial against all defendants

---

[3] Barry had previously been suspended twice, reprimanded once, and had his shift changed based on disciplinary infractions.

except Skrepenak solely on the First Amendment claim based on his speech published in the

Times Leader.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN BARRY,** | : | No. 3:04cv1330 |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **LUZERNE COUNTY, GREGORY** | : | |
| **A. SKREPENAK, TODD** | : | |
| **VONDERHEID, ROBER FUMANTI,** | : | |
| **WISTER YUHAS, and LUZERNE** | : | |
| **COUNTY CORRECTIONAL** | : | |
| **FACILITY BOARD,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 9th day of August 2006, Defendants' Motion for Summary Judgment (Doc. 26) is hereby **GRANTED** in part and **DENIED** in part. We **GRANT** summary judgment on Plaintiff John Barry's due process and equal protection claims. We **GRANT** summary judgment on Plaintiff's First Amendment claim against Defendant Gregory A. Skrepenak. We **GRANT** summary judgment on Plaintiff's First Amendment claim to the extent that it rests on Barry's refusal to cooperate without his attorney present on October 20, 2003. We **DENY** the motion for summary judgment in all other respects.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**